IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| | : |
| | : Case No. WMN- 98-0210 |
| -v.- | : Motion to Reduce Sentence |
| | : Pursuant to 18 U.S.C. |
| | : §3582(c)(1)(A)(i) |
| ANDRE ALBERT ADDISON, | : |
| | : |
| Defendant. | : |
| | : |

FILED
LOGGED   ENTERED
RECEIVED

MAR 17 2022

AT BALTIMORE
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
DEPUTY

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO REDUCE SENTENCE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i)

Defendant, Andre A. Addison, pro se, respectfully moves this Court for an order reducing his sentence based on the "extraordinary and compelling reasons" discussed below, pursuant to the newly amended Compassionate Release statute, 18 U.S.C. § 3582(c)(1)(A)(i).

### INTRODUCTION

Addison, along with other co-defendants, were charged in a ten-count indictment with various crimes related to a cocaine distribution conspiracy. Following trial, a jury convicted Addison, Darrell Burrell and Vernon Ray of conspiracy to distribute more than five kilograms of cocaine in violation of 21 U.S.C. §§ 846 & 841(A)(1), and of killing while engaging in a drug conspiracy, in violation of 21 U.S.C. § 848(e)(1)(A). Addison and Burrell were given life sentences, and Ray was

sentenced to 262 months in prison.

In 2002-03 Addison, Burrell and Ray appealed their convictions. The 4th Circuit concluded on direct appeal that the government presented insufficient evidence that Ray knowing furthered the objectives of the cocaine distribution conspiracy. Because both of Ray's counts of conviction depend on proof of this intent, the 4th Circuit reversed his conviction on the distribution conspiracy count and on the murder count related to the Bernard Miller murder. Ray served a total of 5 years in prison before being released based on his conviction being reversed. See, 2003 direct appeal opinion.

The 4th Circuit concluded, as the government conceded, on direct appeal, that Burrell was denied his statutory right to two counsel. The 4th Circuit therefore vacated his conviction for killing while engaged in a drug conspiracy in relation to the June 12, 1996, Antwan Greer murder. The 4th Circuit vacated his life sentence and remanded for resentencing on the cocaine distribution conspiracy count alone. Upon remand for resentencing in 2003, the district court sentenced Burrell for the distribution conspiracy count alone and enhanced his sentence back to life in prison for the Greer murder having been committed as relevant conduct of the distribution conspiracy.

A decade later when the Supreme Court decided, Alleyne v. U.S., 570 U.S. 99, 133 S. Ct 2151, 2155, 186 L. Ed. 2d 314, in 2013, which held that "any fact that increases the mandatory

minimum is an 'element' that must be submitted to the jury,
Alleyne, 133 S. Ct. at 2155. Burrell successfully challenged
his enhancement for the distribution count to life in prison
for the Greer murder based on the district court alone finding
that the murder was committed as relevant conduct of the
distribution conspiracy, and Burrell was resentenced to the
distribution count and was released from prison.

Burrell was originally arrested on state murder charges
in relation to the June 12, 1996, Antwan Greer murder. He
was then re-arrested two years later on September 3, 1998,
for the Greer murder and he served a total of 17 years in
prison for the Greer murder before being released from custody
in 2013.

On direct appeal in 2002-03 the 4th Circuit confirmed
Addison's conviction on all counts which include his conviction
for the June 12, 1996, Antwan Greer murder charged along with
Burrell. See, 2003 direct appeal opinion.

In sentencing Addison, on November 3, 2000, the district
court only considered the June 12, 1996, Antwan Greer murder
as a sentencing factor because the Greer murder carried the
highest offense level for sentencing purposes which was a
level 43, and the district court sentenced Addison to life
in prison. (See, Sentencing Monitoring Computation Data sheet,
as of 12-28-2021, enclosed, as Ex. A)

The district court on November 3, 2000, also imposed
a term of 5 years of supervised release. (See, also, Monitoring
Computation Data sheet, as of 12-28-2021, enclosed, as Ex. A)

ARGUMENT

The Court now has the authority to reduce Addison's sentence
based on the extraordinary and compelling circumstances presented
here. First, it has jurisdiction to hear this motion because
more than 30 days have passed since the Warden received Addison's
request on November 17, 2021, asking that he move this Court
for a reduction of his sentence under 18 U.S.C. § 3582(c)(1)(A)(i).
(See, Addison's November 17, 2021, request to Warden E. Bradley,
requesting that he make a motion on his behalf to the Honorable
Judge William M. Nickerson requesting compassionate release
under 18 U.S.C. 3582(c)(1)(A), enclosed, as Ex. B)

On November 30, 2021, the Warden informed Addison in
writing that he was declining to file such a motion. (See,
Warden E. Bradley's November 30, 2021, response to Addison's
request for a Compassionate Release, enclosed, as Ex. C)

The Director of the Bureau of Prisons ("BOP") has not
filed a motion with this Court in relation to Addison's request.
Second, the changes to 18 U.S.C. § 3582(C)(1)(A)(i) made by the
First Step Act have finally vested the Court with the final
authority to decide when extraordinary and compelling circumstances
warrant a sentence reduction. Such circumstances clearly exist
in this case. Third, the factors a court must consider in
determining an appropriate sentence weigh strongly in favor

4

of a substantially lower sentence for Addison.

A. The Court Has Jurisdiction to Grant Release for "Extraordinary and Compelling Reasons"

The Compassionate Release statute was first enacted as part of the Comprehensive Crime Control Act of 1984. It provided that a district court could modify a final term of imprisonment in four situations, one of which was the existence of "extraordinary and compelling reasons" warranting the reduction, as determined by the sentencing court. Although the courts were given the final authority to reduce a sentence, the statute imposed a gatekeeper -- that authority could be invoked only upon a motion by the Director of the BOP. Without such a motion, sentencing courts were powerless to reduce a prisoner's sentence, even if the court concluded that extraordinary and compelling reasons warranted a reduction. 18 U.S.C. § 3582(c)(1)(A)(i); see also P.L. 98-473 (H.J.Res. 648), P.L. 98-473, 98 Stat. 1837 (Oct. 12, 1984).

This regime changed when Congress enacted the First Step Act, which amended § 3582(c)(1)(A). See P.L. 115-391, 132 Stat. 5194, at § 603 (Dec. 21, 2018). Under the amended statute, a court can now reduce a sentence for "extraordinary and compelling reasons" not only if the Director of the BOP files a motion requesting such relief, but also "upon motion by the defendant," if the defendant has fully exhausted all administrative remedies to appeal the BOP's failure to bring a motion, or if 30 days have elapsed "from the receipt of

5

such a request by the warden of the defendant's facility,"
whichever is earlier. 18 U.S.C. § 3582(c)(1)(A). See also
United States v. Cantu, No. 1:05-CR-458-1, 2019 WL 2498923,
at *3 (S.D. Tex. June 17, 2019) ("[u]nder the newly amended
§ 3582(c)(1)(A) [the defendant] has standing to bring this
motion because more than 30 days elapsed between his reduction-
in-sentence request to the warden and a response."); United
States v. Cantu-Rivera, No. CR H-89-204, 2019 WL 2578272,
at *1 (S.D. Tex. June 24, 2019)(defendant's "petition ... meets
the requirement of a lapse of 30 days from the receipt by
the warden of the defendant's facility ...  The Court therefore
has the authority to address the motion of the defendant.").
As noted above, Addison submitted his request to the Warden
on November 17, 2021. (See, Ex. B)

As of the date of this filing, more than 30 days have
elapsed since the Warden's receipt of the request. The Warden
informed Addison that he would not file such a motion. Accordingly,
Addison is entitled to bring this motion directly to the Court
pursuant to §3582(c)(1)(A), and this Court is vested with
the jurisdiction to rule on the requested relief. (See, Ex. C)

B. The Relief Requested Here Is Consistent with the Text
of the Statute and the Sentencing Commission's Policy Statement

1. Congress Did Not Limit "Extraordinary and Compelling
   Reasons" to a Specific, Enumerated Set of Circumstances

Congress did not define what would constitute an "extraordinary
and compelling reason" warranting a reduction of a sentence

under § 3582(c). Indeed, the legislative history confirms that it intended to grant federal sentencing courts broad discretion to make those determinations on a case-by case basis, and to reduce fundamentally unfair sentences where such reasons exist.

Congress's initial goal in passing the Comprehensive Crime Control Act was to abolish federal parole and create a "completely restructured guidelines sentencing system." S. Rep. No. 98-225, at 52, 53 n.74 (1983). But with the elimination of parole as a corrective measure in cases where early release is warranted, Congress recognized the need for an alternative review process. It therefore allowed for judicial reduction of certain sentences under § 3582(c):

> The Committee believes there may be unusual cases in which an eventual reduction in the length of a term of imprisonment is justified by changed circumstances. These would include cases of severe illness, cases in which other extraordinary and compelling circumstances justify a reduction of an unusually long sentence, and some cases in which the sentencing guidelines for the offense of which the defendant was convicted have been later amended to provide a shorter term of imprisonment.

Id. at 55-56 (emphasis added). Put differently, rather than having the Parole Commission review every federal sentence, Congress decided to let sentencing courts decide, in a far narrower band of cases, that is, those presenting extraordinary and compelling circumstances, that "there is a justification

7

for reducing a term of imprisonment." Id. at 56.

The situations listed in § 3582(c) were thus to serve as "safety valves for modification of sentences," enabling sentence reductions where justified by factors that previously could have been addressed through the (now abolished) parole system. Id. at 121. This approach was intended to keep "the sentencing power in the judiciary where it belongs, "rather than with a federal parole board, and permitted "later review of sentences in particularly compelling situations." Id. (emphasis added). Because Congress chose not to define what constitutes "extraordinary and compelling reasons," the mandate was simple: courts should exercise their discretion in particular cases to determine whether such reasons "justify a reduction of an unusually long sentence." S. Rep No. 98-255, at 55-56 (1983).

Unfortunately, the establishment of the BOP as a gatekeeper effectively eliminated the safety valve. The BOP, which is part of the Department of Justice, hardly ever opened the gate.[1] To address this reality, Congress, through the First Step Act, now allows direct access to the sentencing court once 30 days have elapsed since the inmate submitted a request to the warden.

---

[1]     See, e.g., The Answer is No: Too Little Compassionate Release in US Federal Prisons, Human Rights Watch, 2(Nov.2012), https://www. hrw.org/sites/default/files/reports/us1112ForUploadSm.pgf(noting that between 1992 and 2012, the average annual number of prisoners who received compassionate release following a motion by the BOP was less than two dozen).

2. The U.S. Sentencing Commission Has Not Limited "Extraordinary and Compelling Reasons" for Compassionate Release to Medical, Age-related, or Family Circumstances

When enacting § 3582(c), Congress delegated the responsibility for expounding upon what constitutes "extraordinary and compelling reasons" to the U.S. Sentencing Commission (the "Commission"). See 28 U.S.C. § 994(t) ("The Commission ... shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples."); see also 28 U.S.C. § 992(a)(2) (the Commission shall promulgate general policy statements regarding "the sentence modification provisions set forth in section[] ... 3582(c) of title 18"). The resulting policy statement by the Commission sets forth the following factual considerations: (i) the medical condition of the defendant (including terminal illness and other serious conditions and impairments); (ii) the age of the defendant (for those 65 and older with serious deterioration related to aging who have completed at least 10 years or 75 percent of the term of imprisonment); (iii) the family circumstances of the defendant (where a child's caregiver or spouse dies or becomes incapacitated without an alternative caregiver); and (iv) "other reasons." U.S.S.G. § 1B1.13, Application Note 1(A). The fourth category specifically includes "an extraordinary and compelling reason other than, or in combination with," the first three. Id. Additionally, the commentary makes clear

9

that the extraordinary and compelling reasons "need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment." U.S.S.G. § 1B1.13, Application Note 2. In other words, even if an "extraordinary and compelling reason reasonably could have been known or anticipated by the sentencing court, [that fact] does not preclude consideration for a [sentence] reduction." Id.

As the above language makes clear, extraordinary and compelling reasons for a sentence reduction may exist even where an inmate is not elderly, ill, or facing complicated family circumstances. And though the policy statement -- which has not been amended since the passage of the First Step Act -- vest the Director of the BOP with the authority to determine when such "other reasons" might warrant a reduction in a particular case, that language is inconsistent and cannot be reconciled with the revised statute, which permits a defendant to bring a § 3582 motion to the Court without any response from the BOP or even if the BOP expressly decides that no reasons warrant a reduction of sentence. Accordingly, that aspect of the commentary is not binding on the courts for two reasons: (1) the Guidelines are advisory only, see United States v. Booker, 543 U.S. 220 (2005); and (2) it is inconsistent with the text and the undisputed purpose of the First Step Act, which, "[l]ike other sentencing statutes ... trumps the Guidelines." Dorsey v. United States, 567 U.S. 260, 266 (2012). Congress has finally removed the BOP's blessing as a prerequisite to

relief under § 3582(c). That law trumps § 1B1.13's requirement
of a BOP motion and divests the BOP of its previous authority
to determine whether extraordinary and compelling reasons
warrant a sentence reduction in a particular case. See also
United States v. Da Cai Chen, 127 F.3d 286, 291 (2d Cir. 1997)
(commentary that relates to a statute, or to a guideline that
mirrors a statute (as here), is not entitled to deference);
United States v. Piernanzi, 23 F.3d 670, 683 (2d Cir. 1994).

Indeed, at least three district courts, since the passage
of the First Step Act, have observed that § 1B1.13 "has not
yet been updated to reflect that defendants (and not just the
BOP) may move for compassionate release," United States v. McGraw,
No. 2:02-cr-00018 (LJM)(CMM), 2019 WL 2059488, at *2 (S.D. Ind.
May 9, 2019), and "[b]ecause the current version of the Guideline
policy statement conflicts with the First Step Act, the newly-
enacted statutory provisions must be given effect." Cantu-Rivera,
2019 WL 2578272, at *2 n.1. See also Cantu, 2019 WL 2498923, at
*4 ("Given the changes to the statute, the policy-statement
provision that was previously applicable to 18 U.S.C. § 3582(c)-
(1)(A) no longer fits with the statute and thus does not comply
with the congressional mandate that the policy statement must
provide guidance on the appropriate use of the sentence-
modification provisions under § 3582.").

The Court's authority to reduce Addison's sentence is
not only consistent with the statute, but also with the language
in the policy statement, which makes clear that "[t]he court

11

is in a unique position to determine whether the circumstances
warrant a reduction (and, if so, the amount of reduction)"
and encourages the filing of a motion for compassionate release
where a defendant "meets any of the circumstances set forth
in [the] Application Note." As mentioned above, in amending
the language of 18 U.S.C. § 3582(c)(1)(A), Congress finally
empowered courts to make this critical determination, even
in the face of a BOP determination that a defendant's case
is not extraordinary or compelling.

Thus, just a few years ago, a district court in Texas
held as follows:

> [T]he correct interpretation of § 3582(c)(1)(A) -- based
> on the text, statutory history and structure, and
> consideration of Congress's ability to override any of
> the Commission's policy statements 'at any time' [...] --
> is that when a defendant brings a motion for sentence
> reduction under the amended provision, the Court can
> determine whether any extraordinary and compelling
> reasons other than those delineated in U.S.S.G § 1B1.13
> cmt. N.1(A)-(C) warrant granting relief.

Cantu, 2019 WL 2498923, at *5. See also United States v. Urkevich,
No. 8:03-CR-37, 2019 WL 6037391, at *3 (D. Neb. Nov. 14, 2019)
("this Court may use Application Note 1(D) as a basis for finding
extraordinary and compelling reasons to reduce a sentence" beyond
those listed in (A) through (C)). This Court therefore may make

12

an independant assessment of Addison's case considering whether extraordinary and compelling reasons warrant the reduction of his sentence.[2]

### 3. Extraordinary and Compelling Circumstances Warrant a Reduction in Addison's Sentence

When deciding a motion for relief under 18 U.S.C. § 3582(c)(1)(A)(i), a court should consider a number of health conditions that according to the CDC increase the risk of severe illness (meaning the risk of hospitalization, intensive care, a ventilator, or death) if Addison at the age of 51 contract COVID-19. Addison is also at an increased risk by

---

[2]    See, also Cantu, 2019 WL 2498923, at *4 (Given the changes to the statute, the policy-statement provision that was previously applicable to 18 U.S.C. § 3582(c)(1)(A) no longer fits with the statute and thus does not comply with the congressional mandate that the policy statement must provide guidance on the appropriate use of sentence-modification provisions under § 3582.") Cantu-Rivera, 2019 WL 2578272, at *2 n. 1 (finding authority to determine that defendant was entitled to relief under the "current policy statement predates the enactment of the First Step Act and is not likely to be amended within the foreseeable future due to lack of a sufficient number of serving members of the Sentencing Commission.") United States v. Beck, No. 1:13-CR-186-6, 2019 WL 2716505, at *6 (M.D.N.C. June 28, 2019)("While the old policy statement provide helpful guidance, it does not constrain the Court's independant assessment of whether 'extraordinary and compelling reasons' warrant a sentence reduction under § 3582(c)(1)(A)(i).").

virtue of his age, COVID-19: People with Certain Medical
Conditions, CDC, https://www.cdc.gov/coronavirus/2019-ncov/
need-extra-precautions/people-with-medical-conditions.html
(updated Apr. 29, 2021)("[M]ore than 95 [percent] of COVID-19
deaths occur in people older than 45.") Further compounding
the risk to Addison is the mere fact of his incarceration, see,
e.g., Coreas v. Bounds, 451 F. Supp. 3d 407, 413 (D. Md. 2020)
("Prisons, jails, and detention centers are especially vulnerable
to outbreaks of COVID-19.").  It is well established in many
courts, that "in the grip of a public health crisis more severe
than any seen for a hundred years," Antietam Battlefield KOA v.
Hogan, 461 F. Supp. 3d 214, 223 (D. Md. 2020), serious chronic
medical conditions that put incarcerated people such as Addison
at increased risk of severe illness from COVID-19 are extraordinary
and compelling reasons for compassionate release, see, e.g.,
United States v. Boyce, No. CR CBB-07-383, 2021 U.S. Dist. LEXIS
26129, 2021 WL 488526, at *2 (D. Md. Feb. 10, 2021). See, Wise v.
United States, Criminal No. ELH-18-72, 2020 U.S. Dist. LEXIS 90431,
2020 WL 2614816, at *7 (D. Md. May 22, 2020). More than forty
percent of people incarcerated at USP Pollack have contracted
COVID-19 over the last sixteen months. See COVID-19- Coronavirus,
BOP, https://www.bop.gov/coronavirus.last accessed May 4, 2021)
(documenting 518 recovered prisoner cases of COVID-19); USP
Pollock, BOP, https://www.bop.gov/locations/institutions/pol/
(noting population of 1,248 at institution).

In addition, when deciding a motion for relief under
18 U.S.C. § 3582(c)(1)(A)(i), a court should consider other
factors, including the history and characteristics of the
defendant, the sentencing disparities with his co-defendants,
and other factors that bear on who the defendant is today. See
U.S.S.G. § 1B1.13 (requiring consideration of, inter alia, the
factors set forth in 18 U.S.C. § 3553(a); see also Urkevich,
2019 WL 6037391, at *4 (considering 3553(a)(2)(A) (need for
"just punishment") and 3553(a)(6) ("need to avoid unwarranted
sentence disparities among" similary situated defendants) when
finding "extraordinary and compelling reasons" for reduction in
sentence); United States v. Walker, No. 1:11 CR 270, 2019 WL
5268752, at *2 (N.D. Ohio Oct. 17, 2019) (considering "post-
offense developments" under § 3553(a) "in order to take into
account the most up-to-date picture of the defendant's history
and characteristics" (internal quotation omitted)); Cantu-Rivera,
2019 WL 2578272, at *2 (the court considered rehabilitation and
the "unwarranted [sentencing] disparities among defendants" in
determining resentencing was appropriate). As set forth below,
these factors establish the sort of "extraordinary and compelling
reasons" that warrant a reduction of Addison's Life sentence.

During Addison's November 3, 2000, sentencing hearing,
the district court granted Addison a 1 point downward departure
from his base offense level, based on the harsh living conditions
while Addison was being held in custody at the former Baltimore
City Detention Center which did not supply heat during the

15

winter months, and which was roach and rat infested during Addison's entire stay at the Baltimore City Jail, which is now closed do to its former conditions and the violence etc. The 1 point reduction would have drastically reduced Addison's sentence from Life in prison to 30 years had the 4 level enhancement for leader and organizer of the distribution conspiracy charged in Count One of the indictment only had been applied to the drug distribution count charged as Count One.

Unfortunately, the district court applied the 4 level enhancement to Count Two of the indictment which charged the Greer murder, and the 4 level enhancement increased Addison's sentence to Life in prison for the June 12, 1996, Greer murder, and the district court imposed a mandatory Life sentence pre-Booker when the sentencing guideline was mandatory.

Addison was found guilty by the trial jury of Count One of the indictment which charged the drug conspiracy. The base offense level for the drug distribution conspiracy was 38. When the 4 level enhancement for leader and organizer of the distribution conspiracy is applied to the based offense level of 38, the based offense level increases to a level 42, which amounts to a 30 year sentence for the drug distribution conspiracy charged as Count One of the indictment. When you apply the 1 point downward departure granted by the district court, the base offense level would then decrease to a base offense level of 41 which amounts to 30 years or under, if

the distribution conspiracy charged in Count One of the
indictment was being considered in determining Addison's
sentence, which it was not considered at all.

Addison also was found guilty of Count Two of the
indictment which charged him and Burrell with the June 12, 1996,
murder of Antwan Greer, and that murder was charged as a murder
committed in furtherance of the distribution conspiracy charged
in Count One of the indictment. The base offense level for the
1st degree Greer murder charged as Count Two of the indictment
was a level 43, which amounts to a sentence of Life in prison.
When you apply the 1 point downward departure granted by the
district court, the base offense level would then decrease to
a base offense level of 42, which amounts to a 30 year prison
sentence, which Addison's attorney was hoping for with the 1
point downward departure granted.

When determining Addison's sentence, the district court
decided to only consider the Greer murder conviction charged as
Count Two of the indictment, which carried the highest offense
level charged.

The murder conviction for Count Two of the indictment
started at a base offense level of 43, which carried a mandatory
sentence of Life in prison.

The district court granted the 1 point downward departure
for the harsh jail conditions which decreased Addison's base
offense level from a level 43, which carried Life in prison, to

17

a base offense level of 42, which amounted to a 30 year prison
sentence.

The district court then adopted the probation officers
recommendation and calculations in the Pre-sentence Report (PSR),
which applied the 4 level enhancement for the leader and organizer
of the distribution conspiracy to the Greer murder conviction
charged as Count Two of the indictment, and by applying that 4
level enhancement to the murder charged as Count Two of the
indictment, Addison's base offense level increased from a level
42, which carried 30 years in prison, to a base offense level of
46, which amounted to a sentence of Life in prison.

Addison's attorney objected arguing that the 4 level
enhancement for leader and organizer can only be applied to
Count One of the indictment which charged Addison with the
distribution conspiracy, and could not be applied to the Greer
murder charged in Count Two of the indictment, which was the
count and charge being considered by the district court in
determining Addison's sentence.

The district court adopted the probation officers
recommendation and calculations in the Pre-sentence Report
(PSR), and sentenced Addison to a mandatory Life sentence under
the pre-Booker mandatory sentencing guidelines.

C. The Relevant Factors Weigh Strongly in Favor of a
     Sentence Reduction

In deciding Addison's request for a sentence reduction, the
Court must determine whether, after considering the factors set

forth in 18 U.S.C. § 3553(a), extraordinary and compelling circumstances warrant that relief, and if they do, that Addison is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g). U.S.S.G. § 1B1.13. As explained below, all of the § 3553(a) factors weigh strongly in favor of relief in Addison's case, and he pose no danger.

1.    The Relevant § 3553(a) Factors Weigh Strongly in Favor of Relief

As discussed above, Section § 3553(a)(2) requires a court to consider the necessity of the sentence imposed to reflect the seriousness of the offense, afford adequate deterrence, protect the public from Addison, and provide Addison with rehabilitative services. These factors weigh strongly in favor of the relief requested here. The more than 24 years that Addison has already served in prison have transformed him. He has dedicated himself to the rehabilitation of himself and others, fulfilling the objectives of § 3553(a)(2) that incarceration "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment."

Addison entered prison at the age of 27 and have grown and matured tremendously and now is at the age of 51. Before entering prison, Addison at the age of 21 attended Catonsville Community College where he took college courses during the fall and winter semister of 1991-92, and he continued during

19

the spring semister of 1992. Addison returned to finish taking college courses at Catonsville Community College during the fall and winter semister of 1992-93, and after attending college for the sping semister of 1993, Addison did not earn enough credits to graduate with an AA-degree which was his plans.

After attending Catonsville Community College, Addison in 1994 attended All State Career Institute in Baltimore, where he received vocational training in carpentry, brick masonry, electrical and plumbing. Addison did not receive the certificate that he was attempting to achieve because during the 7 months of the 9 month course All State Career Institute canceled the course because of low enrollment. (Addison's records and college transcripts can be found at the Catonsville Community College Records Department for the 1991-92 semisters, and for the 1992-93 semisters.); (Addison's records and transcripts for his 7 months of attendance at All State Career Institute for the 9 month vocational training course, can be found at the All State Career Institute Students Records Department for the 1994 course.)

Addison since being incarcerated has applied his education and vocational training to numerous jobs that he has held while incarcerated. Addison has performed many jobs during his incarceration which include working in food service, the education department, facilities department which does maintenance duties around the institution, and has worked for the landscaping department.

In 2011 Addison completed a 6 month course which certified him to be a receptionist and which included training him in records maintenance. Addison also completed a course in data entry at that same time where he learned the basic functions of a computer and how to program a computer which include creating websites and creating power-point presentations. Addison received a data entry certificate for completing that course as well.

Since 2014 Addison has maintained a job as the Head Orderly on Unit B-1 at USP Canaan. Addison has his own duties to perform on the daily basis as the Head Orderly as well as additional duties. Addison's job and duties consist of clerical duties along with keeping an inventory of all of the warehouse stock which include janitorial related cleaning supplies for Unit B-1.

Addison also distributes the toilet paper and cleaning chemicals and supplies to all of the inmates who reside on Unit B-1 which is used to clean there cells. Addison's job and duties also consist of cleaning and maintaining the officers office as well as the unit counselors offices on the daily basis.

Addison's job and duties also include the responsibility for distributing all cleaning supplies to the unit orderlies daily so that they can perform their assigned cleaning duties.

Addison also supervise the other B-1 orderlies and make sure that they perform thier assigned jobs and duties daily which include sweeping and mopping the lower and upper floors, and wiping the lower and upper floor walls.

Addison supervise the removal of all trash on Unit B-1

21

and make sure that all of the trash cans are cleaned daily.

Addison supervise the cleaning and disinfecting of all of the upper and lower showers in Unit B-1.

Addison supervise the cleaning of both sally ports and all mop closets in Unit B-1.

Addison supervise the cleaning of the activity rooms, and the cleaning of all excercise equipment on Unit B-1.

Addison supervise the cleaning of all Ice machines, telephones and computers on Unit B-1.

Addison supervise the cleaning of all water fountains, windows and tables on Unit B-1.

When the CDC recommended and implemented additional cleaning throughout this Coronavirus pandemic, Addison helped sanitize Unit B-1 to stop or prevent the spread of COVID-19. (See, B-1 Unit Orderly Assignments, enclosed, as Ex. D)

Addison has also included letters of support from the B-1 Unit Team Unit counselors and case managers. (See, letters of support from members of the Unit Team from B-1 who has been assigned to work on Unit B-1 over the past 9 years, enclosed, as Ex. E)

Addison's job and responsibilities as the Head Orderly on Unit B-1 since 2014 has improved his ability to effectively communicate with others which include his peers as well as the staff members. Addison has developed these skills with the hope of becoming employed with a business that performs janitorial services, and Addison would like to some day own and operate his very own janitorial business if granted relief by this

Court.

Also, if granted relief by this Court, Addison plans on using all of his experience, training and skills in carpentry, plumbing, electrical and brick masonry to secure and maintain employment. This factor weighs heavily in support of granting relief. See Cantu-Rivera, 2019 WL 2578272, at *2 (recognizing the "extraordinary degree of rehabilitations" Mr. Cantu-Rivera accomplished and caring for other inmates as factors justifying the reduction in his sentence). The 24 years that Addison has already served is more than sufficient to achieve the objectives of his sentence and incarceration, including to deter similar misconduct.

Section § 3553(a)(2) requires a court to consider the necessity of the sentence imposed to reflect the seriousness of the offense, afford adequate deterrence, protect the public from Addison, and provide Addison with rehabilitation services. These factors weigh strongly in favor of the relief requested here. The more than 24 years that Addison has already served in prison has transformed him. Addison was convicted of killing in furtherance of the drug distribution conspiracy which resulted in the Life sentence imposed by the Court on November 3, 2000, during the sentencing hearing. The June 12, 1996, Antwan Greer murder conviction was the only sentencing factor considered by the Court in sentencing Addison to Life in prison, pre-Booker when the guidelines were mandatory. The time that Addison has already served which amounts to a total of 24 years or 288 months of

incarceration does not include the credit toward Addison's sentence for good behavior that he would have undoubtedly received had he been given a term-of-years sentence. The 288 months that Addison has served is more appropriately viewed as the equivalent of 324, or 27 years when you include the 36 months or 3 years of good time credit that Addison has earned. The district court also sentenced Addison to a term of 5 years of supervised release, pre-Booker, which totals to an additional 60 months added to the 324 months of incarceration which brings the total number of months served to 384 or a total of 32 years served. The total of 384 months or 32 years is more than sufficient to achieve the objective of his sentence and incarceration, including to deter similar misconduct.

At the time of Addison's sentencing, a Life sentence was mandatory pre-Booker. Today, though the sentencing guidelines would likely still advise that the court impose a Life sentence, see U.S.S.G. §§ 2A1.1, 2E1.3; 18 U.S.C. § 3553(a)(4) (court to consider the applicable guideline sentence), the guidelines are advisory advisory and not binding on the court. This is a significantly changed landscape, and it allows the court to take into account Addison's full history in determining the sentence that is sufficient to comply with the purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2).

In the case of David Furtado Gray, Crim. No. CCB-95-364, at 11, 2021 U.S. Dist. LEXIS 88855 (D.MD. May 10, 2021), who was convicted of a drug related murder and sentenced to life in prison,

24

this court in resentencing Gray pursuant to his motion for a
sentence reduction took into consideration that the crimes
committed was serious, and concluded that "the 27 years he
served is a very long period of incarceration that represents
a substantial punishment. Considering the credit toward his
sentence for good behavior that Gray would have undoubtly
received had he been given a term-of-years sentence, the 324
months Gray has served is more appropriately viewed as the
equivalent of 372 months, or thirty-one years. See 18 U.S.C. §
3624(b)(1). This sentence is consistent with the average sentence
imposed over the past five years for first-degree murder. See
United States Sentencing Commission, Interactive Data Analyzer,
Average and Median Sentence Length, 2016-2020, Guideline § 2A1.1,
https://ida.ussc.gov/analytics/saw.dll?Dashboard (last accessed
May 4, 2021) (showing average sentence of 302 months.)"

Addison has served the estimated average sentence imposed
over the past 5 years for first degree murder which is 302
months. Addison has served a total of 288 months, or 24 years,
and when you include his good time credit earned which amounts
to an additional 36 months, or 3 years, that totals to 324
months in prison, which is more than the estimated 302 months
imposed over the past five years for first degree murder. Then
when you include the 5 years of supervised release imposed by
the Court, that's an additional 60 months, or 5 years added,
which then totals to 384 months, or 32 years served by Addison.

25

This Court has observed: "Other judges in this district have similarly recognized the bluntness of mandatory life-sentences the district court was required to impose prior to Booker, and have reduced life sentences for defendants whose offenses included participation in drug-related killings or in drug conspiracies that involved murder reasonably foreseeable to them. United States v. Gray, Crim. No. CCB-95-364, at 11, 2021 U.S. Dist. LEXIS 88855 (D. Md. May 10, 2021) (reducing life sentence to 31 years) (citing United States v. Hill, No. CR JKB-96-00399, 2020 U.S. Dist. LEXIS 75679, 2020 WL 2089379, at *2 (D. Md. Apr. 30, 2020); Carter v. United States, No. CR ELH-00-0100, 2020 U.S. Dist. LEXIS 68343, 2020 WL 1914766, at *9 (D. Md. Apr. 17, 2020); United States v. Cheese, No. CR ELH-98-259, 2020 U.S. Dist. LEXIS 116606, 2020 WL 3618987, at *10 (D. Md. July 2, 2020); Brown v. United States, No. CR ELH-00-0100, 2020 U.S. Dist. LEXIS 45106, 2020 WL 1248950, at *10 (D. Md. Mar 16, 2020)). And other federal district courts have reduced once-mandatory life sentences of defendants who, like Gray, were convicted of murder under 18 U.S.C. 1959(a)(1) when they were very young and, with no possibility of release, afterwards committed their lives to their rehabilitation and to mentoring others. See, United States v. Cruz, No. 3:94-CR-112 (JCH), 2021 U.S. Dist. LEXIS 68857, 2021 WL 1326851, at *15 (D. Conn. Apr. 9, 2021)(reducing sentence to time served at nearly 27 years); United States v. Perez, No. 3:02CR7 (JBA), 2021 U.S. Dist. LEXIS 41040, 2021 WL 837425, at *6 (D. Conn.

Mar. 4, 2021) (reducing sentence to time-served at twenty-three years).

Finally, this Court should consider the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. 18 U.S.C. § 3553(a)(6); see also Cantu-Rivera, 2019 WL 2578272, at *2 (finding a reduced sentence would "also avoid unwarranted disparities among defendants with similar records convicted of similar conduct" because defendant's time served "exceeds the sentences imposed on other members of the drug-trafficking conspiracy.") This factor, too, weighs strongly in favor of a sentence reduction for Addison. There is a glaring disparity between Addison sentence and those of his co-conspirators who simply pled guilty, as shown below:

Lloyd Taylor as an unindicted co-conspirator who cooperated, and who participated in the September 7, 1997, murder of Bernard Miller, provided his testimony before the federal grand jury in June/July 1998 in relation to his participation in the Miller murder along with others which provided probable cause to secure the federal indictment to charge that murder, and in exchange for his cooperation Taylor was never charged or indicted for that murder.

Kelly McLeod as a co-conspirator cooperated and pled guilty to the September 7, 1997, Miller murder, and in exchange for his cooperation he was sentenced to 151 months in prison. He was released from prison years ago.

27

Marcel Brown as a co-conspirator cooperated and pled guilty also to the September 7, 1997, Miller murder, and in exchange for his cooperation he was also sentenced to 151 months in prison. He too was released from prison years ago.

Adrian Boone pled guilty also to the September 7, 1997, Miller murder without cooperating and was sentenced to 235 months in prison, which amounts to 19 years and 7 months in prison. He too was released from prison years ago.

Keith Cook pled guilty also to the September 7, 1997, Miller murder without cooperating and was sentenced to 240 months in prison, which amounts to 20 years in prison. He too was released from prison years ago.

Vernon Ray stood trial for the Miller murder and was convicted by the jury and was sentenced to 262 months in prison, which amounts to 21 years and 10 months in prison. He too was released from prison years ago.

The glaring disparity between Addison's sentence for the June 12, 1996, Greer murder, and the sentence for the other co-conspirators for the September 7, 1997, Miller murder is the fact that no one was sentenced to a mandatory Life sentence, including Vernon Ray who stood trial and was convicted by a jury.

Darrell Burrell who was charged for the June 12, 1996, Antwan Greer murder, stood trial and was convicted by a jury and he was sentenced to a mandatory Life sentence for the Greer murder. He too was released from prison years ago.

Addison, who was charged for the June 12, 1996, Greer

murder, stood trial and was convicted by a jury and he too was sentenced to a mandatory Life sentence for the Greer murder.

The glaring disparity between Addison's sentence imposed for the Greer murder and the sentences imposed on other members of the drug distribution conspiracy for the Miller murder, is the fact that Addison's Life sentence imposed exceeds the non-Life-sentences imposed on the other members of the drug distribution conspiracy for similar conduct. The others pled guilty to the Miller murder except for Vernon Ray who stood trial for that particular murder, and Addison and Burrell stood trial for the Greer murder. Addison and Burrell received mandatory Life sentences. Burrell was released from prison in 2013. This is similar to the disparities that the Court considered pursuant to 18 U.S.C. § 3553(a)(6), in Cantu-Rivera, 2019 WL 2578272, at *2 (finding a reduced sentence would "also avoid unwarranted disparities among defendant's with similar records convicted of similar conduct" because defendant's time served "exceeds the sentences imposed on other members of the drug-trafficking conspiracy.")

2.    Addison Is Not a Danger

If Addison were released, he would not pose a danger to the safety of any person or the community. Addison was 27 years old at the time of his arrest in 1998 and is now a mature 51 year old who sees the world completely different from his lifes experiences. Addison has mentored younger inmates as well as

older inmates to look at the brighter side of life and has encouraged them to be positive and contribute to there living environment while in prison and to do the same when they are released from prison. Addison wants to mentor everyone who he can and be a positive and productive member of society if this Court grants him relief. Addison is no-longer the same person who he was when he entered prison. Addison over the years has become a model prisoner who has learned positive ways to overcome disadvantages related to his upbrining in a low-income environment. Throughout Addison's incarceration, he has maintained an optimistic and positive outlook on life. Addison's personal characteristics are strong indications that he is now a grown and mature man who poses no risk to the community and is likely to become a productive and valuable member of society on release.

D.  Addison Is Deserving of Mercy

With the passage of the First Step Act, Congress emphasized the imperative of reducing unnecessary incarceration and avoiding unduly punitive sentences that do not serve the ends of justice. United States v. Simons, No. 07-CR-00874, 2019 WL 1760840, at *8 (E.D.N.Y. Apr. 22, 2019). Addison's conduct and initiative during his incarceration demonstrate rehabilitation. Addison was raised Catholic and attended Catholic schools and attributes his tremendous changes for the better to his Catholic faith. Addison reads the Bible every night and attends church regularly on Sundays.

Addison is a father of four and remains very close to them along with his two grand-children, who are very supportive of him and committed to helping him become a productive, law abiding member of society. If released, he plans to live with his daughter in North Carolina and hopes to spend as much time as possible supporting his children and grand-children, who he have yet to spend quality time with outside of the prison walls since 1998 when his kids were 2, 3 and 4 years old.

In addition to participating in courses and events that will better himself, Addison has even volunteered for his community during his incarceration, with the most recent being for this Covid-19 pandemic.

As, described above, if released, Addison would pursue jobs in carpentry, plumbing, electrical and brick masonry or janitorial services, which are skills that he has honed from the many trade courses and jobs that he has maintained prior to his incarceration, and that he has held during his incarceration.

Finally, Addison has demonstrated a determination to be a better person. He credits the positive change in his life to his Catholic faith and the support of his family. If released, Addison would like to dedicate himself to volunteering with youth in North Carolina who are at risk of entering the criminal justice system as he did.

In sum, Addison's improved conduct in prison over the past years, extensive efforts at rehabilitation, and family support demonstrate that he is deserving of the relief he seek.

## CONSCLUSION

Congress never intended to permit, let alone to mandate, the excessive punishment Addison received in this case. It has now given the Court the power to grant Addison's relief from that sentence. Addison respectfully requests that the Court take this opportunity to grant a reduction in his sentence to time served based on extraordinary and compelling reasons, which would include the 24 years that he has already served, as well as include the good time credit that he has accumulated over the years, and he would still have the 5 years of supervised release that the Court initially imposed.

DATED: March 2, 2022

Andre Albert Addison

32

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on 2nd day of March 2022, a copy of the foregoing Motion for a Sentence Reduction pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), was mailed, first class mail, postage prepaid, to the Office of the United States Attorney, at 36 S. Charles Street, Fourth Floor, Baltimore, Maryland 21201, for the Assistant U.S. Attorney who is assigned to handle former Assistant U.S. Attorney Jamie M. Bennett's case load.

Andre Albert Addison

33